United States District Court
Southern District of Texas
**ENTERED**
October 04, 2023
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| AUDREY K. MILLER, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:15-CV-2927 |
| | § | |
| UNIVERSITY OF HOUSTON – | § | |
| DOWNTOWN, *et al*. | § | |
| | § | |
| Defendants. | § | |

**ORDER**

Pending before the Court is Defendant University of Houston-Downtown ("UHD") and University of Houston System's ("UHS") (collectively the "Defendants") Motion for Summary Judgment. (Doc. No. 164). Plaintiff Audrey K. Miller ("Miller" or "Plaintiff") responded in opposition. (Doc. No. 176). UHD filed a Reply (Doc. No. 184), and Plaintiff filed a Sur-Reply. (Doc. No. 198). After considering the motions, the admissible evidence, and the law, the Court **GRANTS** Defendants' Motion for Summary Judgment. (Doc. No. 164).

**I. Background**

Plaintiff brought this employment action against Defendants, alleging that Defendants retaliated against her in violation of Title VII. Specifically, Plaintiff alleges that Defendants did not hire her for "opposing conduct that she reasonably and in good faith believed to be unlawful under Title VII and for filing a charge of discrimination under Title VII" against a previous employer. (Doc. No. 1 at 5).

Plaintiff has her Ph.D. in Clinical Psychology and completed a postdoctoral fellowship in Clinical-Forensic Psychology. After finishing her studies, Plaintiff became a tenure-track Assistant Professor in the Clinical Doctoral Program in the Psychology and Philosophy Department at Sam

Houston State University ("SHSU"). While teaching at SHSU, she published numerous articles, a book chapter, and made thirty presentations. After working for SHSU for approximately five years, Plaintiff applied for Associate Professor with Tenure, but her application was denied. As Plaintiff alleges in a separate lawsuit, she was denied the promotion and tenure because of her gender and because she had raised concerns about the mistreatment of women in her department before applying for the position. For that reason, she filed a charge of sex discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") in connection with her promotion and tenure denial at SHSU. Additionally, Plaintiff began searching for other employment opportunities.

Plaintiff applied to UHD for one of three open psychology faculty positions. UHD interviewed Plaintiff but ultimately offered the positions to other candidates. Plaintiff argues that UHD chose not to hire her because of her protected conduct at SHSU and that UHD's conduct constitutes unlawful retaliation under Title VII. Defendants deny these allegations and filed a Motion for Summary Judgment.

## II. Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

### III. Analysis

In their Motion for Summary Judgment, Defendants argue that Plaintiff has failed to establish a prima facie case of retaliation, that UHD had a legitimate, non-discriminatory reason for not hiring Plaintiff, and that Plaintiff cannot demonstrate that UHD's reasons were pretextual. (Doc. No. 164). Plaintiff responded, contending that she has provided sufficient evidence to establish a prima facie case of retaliation and that Defendants' proffered reasons for their failure to hire are pretextual. (Doc. No. 176). Defendants also dispute Plaintiff's contention that UHS, in addition to UHD, can be considered Plaintiff's "employer" for the purposes of her failure to hire claim. (Doc. No. 164 at 36; Doc. No. 176 at 64).

The Court will address each of these points, but will first generally address the objections to Plaintiff's "evidence" that she has attached to her response.

**A. Evidence Objections**

Defendant UHD objects to various exhibits and parts of exhibits that Plaintiff attached to her Response. (Doc. No. 184 at 22-27). In particular, UHD argues that certain Paragraphs contained in Plaintiff's declaration are not admissible because they are not relevant or contain conclusory or speculative assertions. (*Id.* at 23). UHD also complains that Plaintiff lacks personal knowledge to make some of the statements she makes, and the declaration contains inadmissible hearsay. (*Id.* at 24). Additionally, UHD lodges relevance objections to 47 exhibits, hearsay objections to 30 exhibits, and objects to one exhibit because it lacks the proper authentication. (*Id.* at 25-26).

The Court notes as a general matter that an individual does not have personal knowledge of an event if the person acquired that knowledge from another document or source rather than from the individual's personal perception. *See* Fed. R. Evid. 602 Advisory Committee Notes (1973). Additionally, any statement that is out of court and offered for its truth is inadmissible; classifying certain documents as "testimonial statements to this Court" does not change the nature of the evidence. If a statement is made outside of testifying at the current trial or hearing, it is inadmissible hearsay unless it is demonstrated that it meets one of the outlined exceptions. *See* Fed. R. Evid. 801.

The Court will only address specific objections further if the evidence becomes relevant to the Court's analysis.

**B. Retaliation**

Title VII prohibits an employer from discriminating against any of its employees or applicants for employment for "making charges, testifying, assisting, or participating in enforcement proceedings." 42 U.S.C.A. § 2000e-3.

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A party can establish Title VII discrimination with either direct or circumstantial evidence. *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). Where, as in this case, a plaintiff's case is built upon circumstantial evidence, courts rely upon the *McDonnell Douglas* framework for their analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). In *McDonnell Douglas*, the Supreme Court outlined a three-part framework to analyze a discrimination claim. First, the plaintiff must establish a prima facie case of discrimination. *Id.* If the plaintiff does so, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* If the employer provides a legitimate, nondiscriminatory reason for the employee's rejection, the burden shifts back to the plaintiff to prove that the employer's reason was pretext for discrimination. *Id.* at 804–05. Using the *McDonnell Douglas* framework, the Court will determine whether Plaintiff in this case presented a viable retaliation claim.

### i. Prima Facie Case

To successfully prove a prima facie case of retaliation under Title VII, Plaintiff must show "(1) that the plaintiff engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action." *Brandon v. Sage Corp.*, 808 F.3d 266, 270 (5th Cir. 2015).

Defendants argue that the Court should grant summary judgment in their favor because "Plaintiff has not met her burden to demonstrate a prima facie case of retaliation." (Doc. No. 164

at 16). Specifically, Defendants argue that Miller has not established (1) "that UHD's ultimate decision-maker was aware that she had engaged in protected activity." (Doc. No. 164 at 16), and thus (2) cannot establish a causal link between her protected activity and UHD's decision. (Doc. No. 164 at 17). Plaintiff disagrees, contending that she "engaged in protected activities and Defendants knew it." (Doc. No. 176 at 18).

While Defendants present these arguments as two separate contentions, the case law makes clear that both issues fall under the third element of the prima facie case: whether a plaintiff can show that a causal link existed between the protected activity and the adverse action.

The Fifth Circuit has specified that "a 'causal link' is established when the evidence demonstrates that the [adverse action] was based in part on knowledge of the employee's protected activity." *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 684 (5th Cir.2001) (citation omitted). "Although the plaintiff's burden at the prima facie stage is not onerous, the plaintiff must produce at least some evidence that the decisionmakers had knowledge of [her] protected activity." *Manning v. Chevron Chemical Co.*, LLC, 332 F.3d 874, 883 n. 6 (5th Cir.2003). "[T]he mere fact that some adverse action is taken after an employee engages in some protected activity will not always be enough for a prima facie case." *Swanson v. General Services Admin.*, 110 F.3d 1180, 1188 n. 3 (5th Cir.1997). However, "[t]he plaintiff need not prove that her protected activity was the sole factor motivating the employer's challenged decision" to meet this burden. *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002). Instead, at summary judgment, the plaintiff "must at least raise a question about whether the person who [acted adversely] was aware of the protected activity." *Davis v. Dall. Area Rapid Transit,* 383 F.3d 309, 320 (5th Cir. 2004).

6

### a. "Protected Activity" and "Adverse Employment Action" Requirements

The Court finds that Plaintiff suffered an adverse employment action when UHD failed to hire her for the open faculty position. See *Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 555 (5th Cir. 1997) (finding that "adverse employment actions include…refusals to hire."). Therefore, the first question the Court must answer is whether engaging in a protected activity at a previous job for a different employer and discussing that activity with a prospective employer constitutes a protected activity as to the prospective employer. The parties have not cited to case law, nor has the Court located case law, directly on point with this scenario.[1] That said, if it constitutes protected activity under Title VII for an employer to refuse to hire an individual because he or she filed an EEOC claim at a prior employer, then it follows that it is actionable when a prospective employer fails to hire an individual because of protected conduct, such as complaining about unlawful sex discrimination that occurred at a prior employer. Protected conduct under Title VII is not restricted to filing an EEOC claim. *See* 42 U.S.C. § 2000e–3(a) (listing "opposing any…unlawful employment practice" as protected activity). As such, the Court finds at this stage that such conduct—complaining about unlawful sex discrimination at a prior employer—is sufficient to satisfy the protected activity requirement despite the fact that the protected activity occurred at SHSU rather than at UHD. Plaintiff has thus met her burden to raise a fact issue as to the first two prongs of the prima facie case.

Plaintiff also argues that UHD's decision to seek a professional reference from Plaintiff's Department Chair at SHSU, Dr. Chris Wilson ("Wilson"), was itself an adverse employment action. (Doc. No. 176 at 45). To support this contention, Plaintiff argues that "an average person

---

[1] Title VII retaliation claims are typically premised on an employee's allegations that her present or former employer retaliated against her for engaging in protected activity, such as Miller's claims against SHSU—not a prospective employer.

in such circumstances is likely to be dissuaded from engaging in protected activity if potential employers seek or rely on references from employers or individuals whose actions had been subjects of such protected activity." (Doc. No. 176 at 45-46). Plaintiff admits, however, that UHD asked Plaintiff's permission before reaching out to Wilson, and Plaintiff indicated in her initial application that UHD was permitted to contact all of Plaintiff's former employers. (Doc. No. 176-2 at ¶ 7, 21). Plaintiff has not cited any case law on point to support her contention that a reference call initiated by a prospective employer to a current or former employer (a standard business practice) can, standing alone, constitute an adverse employment action.

The Court finds that Plaintiff arguably suffered an adverse employment action when UHD failed to hire her for the open position. The Court declines to find that UHD's decision to call SHSU for a reference was an adverse employment action. Even if she had not given UHD permission to contact her prior employers (which in and of itself waives any such claim), the mere act of checking references is not an adverse employment action. The Court also finds that Plaintiff satisfied the protected activity requirement by demonstrating that she complained about discrimination at SHSU during the course of her interview process with UHD. Nevertheless, a question remains as to whether a causal link exists between the protected activity and the adverse employment action.

### b. "Causal Link" Requirement

#### i. Knowledge of Protected Activity

Defendants argue that "Plaintiff does not offer any basis to conclude that the ultimate decision-maker on her application was…aware she had engaged in protected activity at SHSU." (Doc. No. 164 at 18). Defendants recognize that, as per Miller's deposition testimony, when the UHD search committee asked her about her tenure denial during her on-campus interview she

responded by saying she was denied tenure because of her gender and due to "concerns" she had raised about the "mistreatment of women in the department at SHSU prior to applying for tenure." (Doc. No. 164-1 at 12, 49:10-14; 54:6-17; 100:25-101:3). Defendants contend that such "vague statements" are not sufficient to establish that Defendants had knowledge of Plaintiff's protected conduct. As discussed above, complaining of mistreatment of women in the workplace is protected conduct under Title VII. Therefore, if Plaintiff communicated such conduct to the final decisionmaker, she has satisfied her burden of establishing a prima facie case of retaliation.

### ii.   Final Decisionmaker

Defendants also argue that Miller cannot establish a causal connection because she did not communicate the information to UHD's final decisionmaker—Dr. DoVeanna Fulton ("Dean Fulton"). As stated in Defendants' Motion, Dean Fulton appointed a search committee to review prospective candidate applications, "as is commonly done with faculty searches at UHD." (Doc. No. 164 at 12). The committee was made up of Search Chair Ruth Johnson ("Johnson"), other Psychology faculty members (Stephanie Babb, Travis Crone, Stacie DeFreitas), and English professor Sucheta Choudhuri. (*Id.*). "The UHD search committee's role was to review applications, conduct interviews, and make recommendations regarding applications." (*Id.*). The Chair of the Department of Social Sciences, Dr. Jeffrey Jackson ("Jackson"), served as a liaison between Search Chair Johnson and Dean Fulton throughout the hiring process.

A causal link between the protected activity and the adverse employment action (here, the failure to hire) "can be established by evidence that the ultimate decision maker, with final authority to hire and fire subordinate employees, merely 'rubber stamped' a recommendation to terminate made by an employee with knowledge of the complaint." *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998). Additionally, causation can be established "even if the

ultimate decision-maker herself holds no discriminatory animus as long as the plaintiff can demonstrate that her decision was influenced by another who does hold such animus." *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 758 (5th Cir. 2017), as revised (Mar. 30, 2017). That said, a causal link is destroyed "if there is evidence that the ultimate decision maker did not merely 'rubber stamp' the recommendation of the employee with knowledge of the protected activity, but conducted an independent investigation into the circumstances surrounding the employee's termination." *Sherrod*, 132 F.3d at 1122.

Defendants argue that Dean Fulton was the final decisionmaker. (Doc. No. 164 at 26). Essentially, they argue that even if the Court finds that Plaintiff engaged in protected activity by informing the search committee members of her complaints against SHSU, she cannot state a claim for retaliation because she did not communicate those complaints directly to Dean Fulton. Plaintiff argues that Dean Fulton was merely a "rubber stamp" for the committee. In Plaintiff's view, if Plaintiff communicated those complaints to the committee, the final decisionmaker was aware of those complaints because Dean Fulton was merely an extension of the committee. (Doc. No. 176 at 43).

Based on the summary judgment evidence submitted to the Court, the hiring process at UHD in 2013 operated in several phases. First, candidate application materials were evaluated and scored by members of the search committee based on factors pre-approved by Employee Services (ESO) on the Applicant Screening Matrix. (Doc. No. 164-1 at 194, 53:14-54:3). Next, the search committee forwarded a list of preferred candidates for phone interviews, including their Matrix scores, to the Dean (in this case, Dean Fulton), who would then authorize the list for phone interviews. (Doc. No. 164-1 at 268, 17:24-18:09). The process repeated itself after the phone interviews, when a list of candidates recommended for in-person interviews was again forwarded

to the Dean. (Doc. No. 164-1 at 270, 28:20-29:10). After in-person interviews, the search committee submitted a final list of recommendations to the Dean. (Doc. No. 164-1 at 338, 32:15-33:03). The Dean would ultimately determine which candidates were hired. (Doc. No. 164-1 at 345, 63:07-63:08).

Plaintiff received initial scores high enough to be invited to a phone interview. (Doc. No. 164-1 at 268, 20:05-20:13). During the application review process, Jackson indicated that he noticed Plaintiff's tenure denial and raised it with representatives from ESO, who instructed him to disregard it during the initial stage of the application process because it was not part of the standard Matrix. Plaintiff was then granted a phone interview.[2] (Doc. No. 164-1 at 192, 46:18-47:02). After her phone interview, she was invited to campus for an in-person interview, which included a teaching demonstration, research presentation, meetings with the Dean and Provost, and informal meals with members of the search committee. (Doc. No. 164-1 at 272, 35:23-36:14). Plaintiff apparently told members of the search committee at some point during her in-person interview that she was denied tenure "because [she] was a woman and because [she] had raised concerns about the mistreatment of women in the department at SHSU" (Doc. No. 176-2 at ¶ 12). Search Chair Johnson's affidavit provides that when Johnson asked Plaintiff why she had been denied tenure she "stated that she believed she had been denied because of her gender and due to "concerns" she had raised at SHSU about gender inequality in the Psychology department at SHSU before she applied for tenure." (Doc. No. 164-1 at 121-122, ¶ 12). Notwithstanding these comments (and the tenure issue, which the search committee was instructed to ignore—at least in

---

[2] Deposition testimony by search committee members Babb and Crone indicates that faculty members had concerns about Dr. Miller's collegiality in her phone interview. (Doc. No. 164-1 at 268, 21:12-21:14; Doc. No. 164-1 at 235, 30:08-30:25). These concerns were ultimately set aside when a third position opened, and the search committee was instructed to bring more candidates to campus for in-person interviews. (Doc. No. 164-1 at 121, ¶ 11).

the initial hiring phase), Plaintiff was included in a list of candidates ultimately recommended to the Dean for her to make the final hiring decision. (Doc. No. 164-1 at 194, 56:03-56:25).

At this time, the evidence shows that Jackson was the primary liaison between the chair of the search committee (Johnson) and Dean Fulton. (Doc. No. 164-1 at 114, ⁋ 19). Jackson testified that he met regularly with Dean Fulton, and that during those meetings "she may or may not want to discuss with [him] the candidates that had visited campus for any number of searches." (Doc. No. 164-1 at 195, 60:22-60:25). Because Jackson had received instruction from ESO earlier in the process to disregard Plaintiff's tenure denial, he testified that he decided to raise the issue with Dean Fulton at this stage. (*Id.* at 196, 61:08-61:09). Jackson stated that "[he] went to the Dean," and asked what the committee should do, "because it was unprecedented, and that [ESO] had told the faculty committee that it wasn't their responsibility to consider this because they had to stick to the [M]atrix." (*Id.* at 196, 61:19-61:13). In response, Jackson testified that "both the dean and ESO said that [he] should call the chair of – at the previous institution." (*Id.* at 196, 61:20-61:22). Johnson also stated that she was "aware that Dean Fulton and Department Chair Jackson had concerns regarding [Plaintiff's] application due to her tenure denial at SHSU" and that they "wanted more information about the basis for the denial." (Doc. No. 164-1 at 122, ⁋ 14). Johnson then reached out to Plaintiff to seek her permission to contact Plaintiff's Department Chair, Wilson, at SHSU. (*Id.*). Johnson received permission from Plaintiff to contact Wilson but noted that Plaintiff "said that Dr. Wilson could provide an unfavorable assessment of her or her work." (*Id.*).

After Johnson received Plaintiff's permission, Jackson called Wilson at SHSU and proceeded to engage in an approximately 14-minute conversation about the tenure denial and other unrelated matters. (Doc. No. 164-1 at 202, 88:13-88:16). Deposition testimony about the call varies

widely. Jackson testified that he only had a "vague memory" of the conversation, but that he recalled "something about mentoring and something about being on campus" and that "some faculty had concerns about those two issues." (Doc. No. 164-1 at 202, 88:05-88:08).  He then testified that "that's all the information [he] got from [Wilson]." (Doc. No. 164-1 at 203, 90:20-90:24). In search committee member Babb's deposition, she testified that she spoke with Jackson in his office after the call with Dr. Wilson concluded, and asked him how it went. (Doc. No. 164-1 at 253, 101:12-101:20). She testified that "[Jackson] told [her] that it was horrible and that Dr. Miller—that Dr. Miller's chair at Sam Houston State conveyed that she was a detriment to the department, and that's the only detail that I remember, but that it did not go well." (*Id*). Shortly after the call, Jackson received a follow up email from Wilson which "sort of qualified" Wilson's previous comments and noted that "some of the [SHSU] faculty members are hard to deal with." (Doc. No. 164-1 at 204, 94:11-94:25). Jackson took this to mean that "the faculty colleagues [at SHSU] had these concerns and that was their justification for voting against the application for tenure." (*Id*.). He testified that he relayed this information to Dean Fulton prior to the final hiring decision. (Doc. No. 164-1 at 205, 97:07-97:08). Dean Fulton stated that Jackson's conversation with Wilson "did not assuage [her] concerns about Dr. Miller as a candidate." (Doc. No. 164-1 at 110, ⁋ 20). Jackson testified that after he relayed the substance of the call to Dean Fulton, Plaintiff was not hired. (Doc. No. 164-1 at 203, 92:01-92:09).

The summary judgment evidence shows that Dean Fulton ultimately relied on information provided by the search committee, rather than undertaking an independent investigation. Johnson expressly stated that the committee was "responsible for reviewing applications, conducting interviews, and making recommendations to Dean Fulton and Department Chair Jackson regarding prospective interviewees and hires." (Doc. No. 164-1 at 120, ⁋ 8). The subsequent follow-up

investigation into the tenure denial (which apparently stemmed in part from Jackson's concerns as expressed directly to the Dean) was conducted entirely by Jackson and committee chair Johnson. There is no evidence to suggest that Dean Fulton relied on any information other than what she received from the standard interview process and the subsequent follow-up investigation by Jackson and Johnson in making her hiring decision. Due to the fact that Dean Fulton did not undertake an "independent investigation," the causal link between the protected activity (Plaintiff's statements to the search committee regarding her concerns about discrimination at SHSU) and the adverse employment action (UHD's decision not to hire Dr. Miller) was not "broken" by an independent final decisionmaker. As such, Plaintiff has presented sufficient summary judgment evidence to create a fact issue as to whether there was a causal link between the protected activity and the adverse employment action.

The Court finds that Plaintiff has made a prima facie case of retaliation because she has raised sufficient evidence to establish that protected activity occurred, that she suffered an adverse employment action, and that a causal link existed between the protected activity and the adverse employment action. Since Plaintiff made a prima facie case of retaliation, the burden shifts to Defendants to give a legitimate, nondiscriminatory explanation for the action UHD took.

**ii. Legitimate, Nondiscriminatory Reason**

Defendants argue that Plaintiff's Title VII claims must fail because they "had legitimate, non-discriminatory reasons for not hiring Plaintiff, and Plaintiff cannot demonstrate that UHD's reasons [were] pretextual." (Doc. No. 164 at 13). "An employer may avoid liability for...discrimination...by producing evidence tending to show that it had a legitimate, nondiscriminatory reason for its disputed decision." *Patrick v. Ridge*, 394 F.3d 311, 316 (5th Cir. 2004). "This burden is one of production, not persuasion; it 'can involve no credibility

assessment.'" *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)).

Defendants primarily contend that their legitimate, nondiscriminatory reason for not selecting Plaintiff was that Plaintiff's tenure denial was "unprecedented" and caused search committee members to have "serious concerns." (Doc. No. 164 at 24). Defendants explain that Plaintiff "didn't impress [] enough" to overlook her not making tenure. (Doc. No. 164 at 24).

Defendants support their conclusion in part by describing their selection process and the opinions of the search committee members. Specifically, Dean Fulton "had serious concerns about Dr. Miller's application...because Dr. Miller had been denied tenure at her then-current employer, Sam Houston State University ("SHSU")." (Doc. No. 164-1 at 109, ⁋ 19). As Dean Fulton explains, she "was concerned about Dr. Miller's tenure denial and the nature of the deficiencies or substandard performance related to her teaching, research, and/or service—the three primary duties of tenured and tenure-track faculty ay UHD." (*Id.*). Jackson's affidavit mirrors Dean Fulton's concerns. (Doc. No. 164-1 at 116, ⁋ 15-17). In his deposition, Jackson stated that being denied tenure is a "very serious issue" and that "it's equivalent to – it's similar to being terminated." (Doc. No. 164-1 at 192, 46:1-46:14). Even Plaintiff acknowledged that failure to receive tenure at SHSU presented a "red flag" for prospective employers. (Doc. No. 164-1 at 8, 15:9-15:12).

Accordingly, it is clear that UHD brought forth a legitimate, nondiscriminatory reason for not selecting Plaintiff for the position. As such, the Court finds that Defendants have met their burden.

### iii. Pretext

In step three of the *McDonnell Douglas* analysis, Plaintiff must bring forth evidence to establish a genuine issue of material fact that Defendant's legitimate reason is a pretext. *McDonnell Douglas*, 411 U.S. at 804-5. Defendants argue that Plaintiff cannot meet her burden to demonstrate that UHD's legitimate, nondiscriminatory reason for not hiring Plaintiff was pretextual. (Doc. No. 164 at 25). Plaintiff disagrees.

Once the employer satisfies its burden of providing a legitimate, nondiscriminatory reason for the employment decision:

> [T]he onus shifts back to the plaintiff to prove either that the defendant's articulated reason is merely a pretext for race [color, sex, national origin, or age] discrimination, or that the defendant's reason, while true, is only one of the reasons for its decision, and another 'motivating factor' is the plaintiff's protected characteristic (the mixed-motives alternative).

*Autrey*, 704 F.3d at 347.

Neither party offers much, if any, argument (and certainly no evidence) as to the mixed-motives alternative, so the Court will focus its analysis on the pretext alternative.

The plaintiff "must substantiate his claim or pretext through evidence demonstrating that discrimination lay at the heart of the employer's decision." *Price v. Fed. Exp. Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). "A plaintiff may establish pretext by showing that a discriminatory motive more likely motivated [his or her] employer's decision, such as through evidence of disparate treatment, or that her employer's explanation is unworthy of credence." *Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 363 (5th Cir. 2013); *see also Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 578 (5th Cir. 2020) ("Pretext can be proven by any evidence that casts doubt on the credence of the employer's proffered justification for the adverse employment action.").

The Fifth Circuit, however, has held some evidence that may be interpreted as evidence of pretext does not preclude summary judgment if that evidence does not raise a "legitimate fact issue as to discriminatory intent." *See Churchill v. Tex. Dept. of Crim. Just.*, 539 F. App'x 315, 320 (5th Cir. 2013). "While [the plaintiff] presented some evidence of pretext, our careful review of the record, viewed in the light most favorable to [the plaintiff's] claim, compels the conclusion that the evidence taken together does not raise a legitimate fact issue as to discriminatory intent." *Id.* *See also Reeves*, 530 U.S. at 148 (explaining that although a plaintiff may set forth evidence to reject an employer's proffered legitimate, nondiscriminatory explanation as pretextual, the case may still present a circumstance where "no rational fact finder could conclude that the action was discriminatory"). The plaintiff's evidence must be "so persuasive so as to support an inference that the real reason was discrimination." *Rubinstein v. Administrators of Tulane Educ. Fund*, 218 F.3d 392, 400 (5th Cir. 2000). Here, Plaintiff has failed to meet such a burden.

In her Response, Plaintiff takes issue with the fact that Defendants' proffered reason for not offering employment to Plaintiff is "manifestly vague" and was "never written down, emailed, or elaborated in any fashion." (Doc. No. 176 at 53). Plaintiff contends that UHD's reason for denying her the position "did not hold water" since "UHD knew about the tenure denial from the outset of her application and still brought her through multiple stage of the review process." (Doc. No. 176 at 52). As further support of Plaintiff's theory she cites to an email from search committee member Babb in which Babb writes "I liked [Plaintiff], I saw no red flags." (Doc. No. 176 at 52). Additionally, Plaintiff argues Defendant's reason is a pretext because "UHD did not list tenure in its 'Requirements' for the positions for which Plaintiff applied." (Doc. No. 176 at 54).

Plaintiff also asserts that Defendants acted discriminatorily since, according to UHD's internal applicant evaluation (the Applicant Screening Matrix), she received "perfect scores" in

both "teaching effectiveness" and "scholarly activity."[3] (Doc. No. 176 at 60). Plaintiff highlights the apparent contradiction between the existence of these baseline scores on the Applicant Screening Matrix and the conclusions of Jackson and Dean Fulton, who noted that Plaintiff's "teaching" and "service" were areas of concern when they considered Plaintiff's candidacy. (Doc. No. 176 at 60; Doc. No. 164-1 at 117, ¶ 17; Doc. No. 164-1 at 109, ¶ 19). Nevertheless, Jackson testified that hiring decisions were often based on more than the initial Matrix scores. (Doc. No. 164-1 at 202, 86:18-86:20). Babb also testified that the numbers on the Matrix "don't mean much" once the candidate gets to the interview stage. (Doc. No. 164-1 at 235, 29:09-29:12). Moreover, Dean Fulton stated that "teaching" and "service" are important attributes for tenure-track candidates in academia generally. (Doc. No. 164-1 at 107, ¶ 7). The fact that Plaintiff obtained "perfect scores" on the initial Applicant Screening Matrix – which did not account for the impact that a tenure denial might have on the committee's evaluation of a candidate's overall "teaching" and "service" abilities – does not necessarily undermine the committee members' testimony that Plaintiff's teaching and service skills remained areas of concern during their review of her candidacy.

Plaintiff also points to Jackson's reference call to Wilson, Plaintiff's Department Chair at SHSU, as evidence that UHD acted with pretext. (Doc. No. 176 at 57). She contends that UHD ignored her positive scores on the Applicant Screening Matrix and relied exclusively on the reference call with Wilson to reject her candidacy. (Doc. No. 176 at 58). As discussed previously, it remains somewhat unclear what was actually discussed on the call between Jackson and Wilson.

---

[3] Deposition testimony indicates that the UHD Applicant Screening Matrix scores referenced by Plaintiff here were calculated based exclusively on Plaintiff's initial application to UHD. (Doc. No. 164-1 at 198, 71:15-71:25, 72:5-72:21). Overall interview scores (on a 1-4 scale, with 1 described in the document as "Unacceptable" and 4 as "Exceptional," were then added to the raw score upon completion. (Doc. No. 164-1 at 200, 79:14-79:20, Doc. No. 176-25).

Moreover, it is undisputed that Plaintiff gave UHD explicit permission to contact Wilson as part of the reference process. Jackson testified that Plaintiff was not offered the job after his phone call with Wilson, but Plaintiff has offered no evidence to raise a genuine fact issue that her protected activity was discussed on the call. (Doc. No. 164-1 at 203, 92:01-92:09). Ultimately, Plaintiff contends that "a reasonable inference...can be made that UHD was not genuinely interested in finding the true facts of Plaintiff's performance at SHSU so much as they were interested in seeking a retaliatory 'reason' to deny her application." (Doc. No. 176 at 64). This conclusory and speculative statement, unsupported by admissible evidence, does not raise a legitimate fact issue as to discriminatory intent.

It is undisputed that Plaintiff had a strong academic record. Such an impressive record apparently warranted an interview. As Defendants stated, however, the decision not to hire Plaintiff was ultimately based on her tenure denial. (Doc. No. 184 at 14). Plaintiff presents no evidence to the contrary. It is one thing not to make tenure a required qualification; it is another thing to be faced with an individual who was denied tenure. For the same reason, UHD's decision not to call the prior employers of the three candidates ultimately hired for the open positions is irrelevant.[4] (Doc. No. 176 at 51). When faced with a candidate who was denied tenure and who was applying for a tenure-track position, UHD had a legitimate reason to contact Plaintiff's prior employer, especially when she granted them permission to do so. This, as discussed above, is a standard hiring practice. Importantly, there is no evidence that the Defendants' reason for not hiring Plaintiff was rooted in discrimination. Rather, Plaintiff's "evidence" consists of what she

---

[4] Plaintiff alleges that "none of the three individuals who were offered and accepted the positions to which Plaintiff applied...had been tenured." (Doc. No. 176 at 56). The positions available were *tenure-track* positions, and Plaintiff fails to recognize the important distinction between a candidate who has not yet achieved tenure and one who has been denied tenure.

describes as a "reasonable inference" built on top of another "reasonable inference." (Doc. No. 176 at 55, 57, 64). This so-called evidence is not sufficient to survive summary judgment.

Importantly, the evidence on the record "is not so persuasive so as to support an inference that the real reason [for not hiring Plaintiff] was discrimination." *Rubinstein v. Administrators of Tulane Educ. Fund*, 218 F.3d 392, 400 (5th Cir. 2000) (finding the plaintiff failed to meet his burden of producing any evidence of discrimination sufficient to survive summary judgment, and "his evidence to rebut the non-discriminatory reasons offered by [the defendant] is not so persuasive so as to support an inference that the real reason was discrimination."). As such, the Court finds that Plaintiff's proffered evidence of pretext does not raise a legitimate fact issue as to discriminatory intent, and grants Defendants' Motion for Summary Judgment.

## C. Cause of action against UHS under Title VII

Having found summary judgment is proper, the Court need not further address Defendants' arguments. Nevertheless, for purposes of judicial efficiency, the Court will discuss whether there is a fact issue as to the possibility of UHS being considered Plaintiff's "employer." The parties characterize this issue as one of standing (Doc. No. 164 at 36, Doc. No. 176 at 64). More correctly, the issue is whether Plaintiff has a <u>cause of action</u> against UHS as Plaintiff's prospective "employer."

In deciding whether Plaintiff can proceed with her claims against UHS, the Court must determine if UHS was Plaintiff's "employer" under Title VII. Importantly, Plaintiff does not argue that UHS and UHD are the same entity for the purpose of Title VII analysis. (Doc. No. 176 at 64). Indeed, the Texas Education Code defines the University of Houston-Downtown as "a separate and distinct institution of higher education" even though "the organization and control of the institution are vested in the board of regents of the University of Houston system." Tex. Educ.

Code Ann. § 111.91. Plaintiff instead argues that UHS is a proper defendant even though it is a separate entity because it "controlled" the UHD hiring process. (Doc. No. 176 at 64).

The Fifth Circuit has held that the determination of employer status for Title VII purposes requires a two-part analysis. *Muhammad v. Dallas Cty. Cmty. Supervision and Corr. Dep't.*, 479 F.3d 377, 380 (5th Cir. 2007). First, a court looks to whether the defendants meet the statutory definition of employer; that is, the defendant must be "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year." 42 U.S.C. § 2000e(b). Second, the court considers whether the requisite employment relationship exists by applying a "hybrid economic realities/common law control test." *Muhammad*, 479 F.3d at 380. The test focuses on whether the defendant has the right to hire, fire, supervise, and set a work schedule for employees. *Id.* Additionally, it considers "whether the defendant in question paid the employee's salary, withheld taxes, provided benefits, and set terms and conditions of employment." *Ridha v. Texas A & M Univ. Sys.*, 2009 WL 1406355, at *4 (S.D. Tex. May 15, 2009).

Plaintiff points vaguely to the UHD Faculty Employment Policies to argue that UHS is responsible for "managing and controlling" universities in the System. (Doc. No. 176 at 64-65). That document outlines the "policies and procedures for employment of faculty at the University of Downtown (UHD)" and does not mention UHS at all. (Doc. No. 176-81). Plaintiff does not proffer evidence to show that UHS, rather than UHD, would have issued Plaintiff's paycheck or issued her a W-2, had she been hired. *See Weeks v. Tex. A&M Univ.*, 2018 WL 1033254 at *6 (S.D. Tex. Feb. 21, 2018), aff'd sub nom. *Weeks v. Tex. A & M Univ. Sys.*, 762 Fed. Appx. 203 (5th Cir. 2019). The relevant inquiry is "who [Plaintiff's] actual employer was" (or would have been). *Id.* Plaintiff has not presented any evidence that UHS exercised control over Plaintiff's

employment or prospective employment. The record is just inadequate to establish that UHS is an employer under Title VII. *See Ridha*, 2009 WL 1406355 at *4 (dismissing Texas A&M University System from a Title VII action because Plaintiff did not allege that Texas A&M University System exercised control over Plaintiffs' employment).

As such, Plaintiff does not have a cause of action against UHS under Title VII.

### IV. Conclusion

The Court finds that the Plaintiff did not meet her burden of raising a material issue of fact as to pretext. It further finds that UHS is not an "employer" for Title VII purposes. For the foregoing reasons, the Court hereby **GRANTS** Defendants' Motion for Summary Judgment. (Doc. No.164).

Signed at Houston, Texas, on this the ____ day of October, 2023.

Andrew S. Hanen
United States District Judge